Chad L. Belville, AZ Bar 020771
Attorney for Plaintiff Cybernet Entertainment.
4742 N. 24th Street, Suite 315
Phoenix, AZ 85016
Telephone: (602) 904-5485
Facsimile:  (602) 291-6953
Email: cbelville@azbar.org

Spencer D. Freeman, WSBA#25069
Attorney for Plaintiff Cybernet Entertainment.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
Telephone: (253) 383-4500
Facsimile:  (253) 383-4501
Email: sfreeman@freemanlawfirm.org

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| CYBERNET ENTERTAINMENT, LLC, a New York Company, | Case No.:  2:12-cv-01101 SRB |
| Plaintiff, | **PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO FED.R.CIV.P. 65** |
| vs. | |
| IG MEDIA INC., et al., | |
| Defendants. | |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................iii

I.      INTRODUCTION...................................................................................1

II.     FACTUAL BACKGROUND....................................................................2

        A.  Plaintiff's Business and Copyrighted Works........................................2

        B.  Defendant's Websites and Copyright Infringement.................................3

        C.  Defendant's Infringement and Cybernet's Intellectual Property.............5

        D.  Defendant's Fraudulent Transfer of Assets Outside the United States...................6

III.    ARGUMENT..........................................................................................8

        A.  Plaintiff is Likely to Succeed on the Merits.........................................10

        B.  Plaintiff is Likely to Suffer Irreparable Harm in Absence of preliminary
            Injunction Relief..............................................................................12

        C.  Balance of Equities Tips in Favor of Injunctive Relief.........................14

        D.  A Temporary Restraining Order and Injunctive Relief is in the Public Interest...15

        E.  *Ex Parte* Relief is Essential...............................................................16

        F.  Cybernet Will Provide Adequate Security if Hardship is Proven.........................20

        G.  Defendants Should Be Ordered To Show Cause Regarding the Issuance of a
            Preliminary Injunction.........................................................................20

IV.     CONCLUSION......................................................................................20

1

<u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>

3

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (1983)...................................16

4

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (201)............................................................10

5

*American Can Company v Mansukhan*i, 742 F.2d 314 (1984).......................................................17

6

*Baxter v. MCA, Inc.,* 812 F.2d 421 (1987)....................................................................................10

7

*Breenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245 (1999)............................................12

8

*Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824 (1997)..........................................15

9

*Century Home Entertainment, Inc. v. Laser Beat, Inc.*, 859 F.Supp. 636 (1994).........................18

10

*Cert Denied,* 523 U.S. 1021, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998).......................................10

11

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (2003)............20

12

*Country Kids 'N City Slicks, inc. v. Sheen*, 77 F.3d 1280 (1996)..................................................13

13

*Datatech v FF Magnet,* Cause No, 3:12-cv-04500.....................................................................8,14

14

*Developments In The Law --- Injunctions*, 78 Harv. L. Rev. 994 (1965).....................................18

15

*eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1066 (2011)..........................................13

16

*Entertainment Research Group, Inc., Genesis Creative Group, Inc.*, 122 F.3d 1211 (1997).......10

17

*Flexible Lifeline Systems, Inc., v. Precision Lift, Inc.*, 654 F.3d 989 (2011)...............................10

18

*Fimab-Finanziaria MaglificioBiellese Fratelli Fila S.P.A v Kitchen,* 548 F.Supp. 2487
(1982).......................................................................................................................................18,19

19

*First Technology Safety Systems, Inc. v. Depinet,* 11 F.3d 641 (1998).......................................19

20

*Fraserside v Dr. Tuber,* Cause No. 12-cv-60931........................................................................8,14

21

*F.W. Wollworth Company v, Contemporary Arts, Inc.,* 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed.2d
268 (1952)....................................................................................................................................9

22

23

24

25

26

1   *Granny Goose Foods, Inc., et al v. Brotherhood of Teamsters*, 415 U.S. 423 (1974)..................17

2   *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127 (2005)....................................................9

3
    *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*, 572 F.3d 644
4   (2009)..............................................................................................................15

5   *In re Estate of Ferdinand Marcos*, 25 F.3d 1467 (1994)..................................................9

6   *International Jensen, Inc. v. Metrasound U.S.A., Inc*., 4 F.3d 819, (1993)......................15

7
    *Lakedreams v. Taylor,* 932 F.2d 1103 (1991)...............................................................13
8
    *Liberty Media Holdings v. Oron,* Cause No. 2:12-cv-01057.........................................8,14
9
10  *Metro-Goldwyn Studios, Inc. v. Grokster, Ltd*., 518 F.Supp2d 1197, 1218 (2007).................12,13

11  *Miller v Universal City Studios, Inc.*, 650 F.2d 1365 (1981)...........................................8

12  *NBA Properties v. Various John Does*, 113 F.3d 1246 (1997)........................................17

13  *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, (1996)...........................................9

14  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (2007)........................................10

15  *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F.Supp. 543 (1997).............................8

16
17  *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc*., 204 F.3f 867 (2000)..................10

18  *Reebok International, Inc. v. Marnatech Enterprises, Inc.*, 970 F.2d 522 (1992)..................19

19  *Religious Tech, Ctr. V. Netcom On-Line Commc'n Servs.*, 907 F.Supp. 1361 (1995)................10

20  *Signal Capital Corp. v. Frank*, 895 F.Supp. 62, 54 (1995)............................................12

21  *Stormans, Inc. v. Selecky,* 586 F.3d 1109, (2009)................................................9,16

22  *S.O.S., v. Payday, Inc.*, 886 F.2d 1081 n.3 (1989)...................................................10

23
    *Speaks v Kruse*, 445 F.3d 396 (2006)....................................................................20
24
    *The Walt Disney Company, v. Jim Garofalo*, 9:02-cv-5314 (1992)..............................19
25
26  *Universal City Studios, Inc. v. Ronnie Lorizo,* 9:03-cv-5182 (SJ) (1993).....................19

U.S. App. LEXIS 11946 (1997)........................................................................17

*Vector Research v. Howard & Howard Attorneys, P.C* 1996 U.S. App LEXIS 7492 (1996)..............................................................................................................19

*Vuitton Et Fils S.A.*, 606 F.2d 1 (1991).......................................................18,19

*Vuitton v. White*, 945 F.2d 569 (1991)........................................................17,19

*Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.*, 824 F.Supp2d 1003, 1012 (2011)........................................................................................................12,13,16

*Winter v. Natural Res, Def. Counsel, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)...................................................................................................9,12,16

STATUTES

Fed.R.Civ.P. 65, 17 U.S.C.  § 502...................................................................1

Fed.R.Civ.Proc. 65........................................................................................17

15 U.S.C § 1116 (d)(1)(A)...............................................................................1

17 U.S.C. § 106...........................................................................................10

17 U.S.C. § 410(c)........................................................................................10

17 U.S.C § 501(a).........................................................................................10

17 U.S.C § 502...............................................................................................9

17 U.S.C § 502(a)........................................................................................10

17 U.S.C § 504...........................................................................................9,12

17 U.S.C § 502-505......................................................................................18

17 U.S.C § 512 (c)........................................................................................11

17 U.S.C § 512(c)(1)(C)................................................................................11

Rule 65.........................................................................................................17

Rule 65(b).........................................................................................................................18

Rule 65(b)(1)....................................................................................................................18

Pursuant Fed.R.Civ.P. 65, 17 U.S.C. §502, and 15 U.S.C §1156(d)(1)(A), Plaintiff Cybernet Entertainment LLC ("Cybernet") moves this Court *ex parte* for a temporary restraining order to stop Defendants IG Media, Inc., International Media, Ltd, and Igor Gens, and their agents from fraudulently transferring assets out of the United States and continuing to violate Cybernet's intellectual property rights.  Cybernet seeks an Order unwinding the fraudulent transfers that have already occurred, freezing Defendants' accounts containing profits from the Defendants' illegal enterprise, and ceasing the public display of Cybernet's intellectual property, copyrights and trademarks.  Because of the serious and immediate nature of Defendants' acts, Cybernet requests an emergency hearing or an expedited ruling on the papers.

## I.     INTRODUCTION

Regardless of the instant lawsuit and over 400 DMCA take-down notices, Defendants continue to infringe Cybernet's copyrights and trademarks.  In blatant disregard of the law and essentially thumbing its nose at Cybernet and the Court, Defendants have re-posted 115 Cybernet videos on seven (7) websites.  Each of these re-posts were the subject of take-down notices delivered to Defendants' DMCA agent in December 2012.  These videos were in fact re-posted in the exact same URLs as was noticed in the take-down notices.

Further, since the inception of this litigation and likely just in the past few months, Defendants have posted *another* 364 Cybernet videos without authorization or license, violating Cybernet's intellectual property rights.  This blatant disregard for Cybernet's intellectual property rights is severely damaging the market value of Cybernet's videos and licenses.

As Defendants flagrantly violate Cybernet's intellectual property rights, they are also systematically moving assets outside the United States and out of the reach of this Court.  It is clear the Defendants intent is to continue to display Cybernet's videos without license or authorization, destroying Cynerbet's reputation and business, and move its assets away from reach of any judgment that could redress their unlawful actions.

1

1    Cybernet is left with no choice but seek equitable relief from the Court in order to protect

2    its goodwill and reputation in the market place, and its business.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Business and Copyrighted Works

Cybernet Entertainment LLC (Cybernet) is the global leader in the production of legal, high quality, authentic adult fetish motion pictures. *Delaration of Peter Acworth In Support of Motion for Temporary Restraining Order ("Decl. P. Acworth"),* p 2, ¶ 2. Cybernet is unlike any other adult oriented company in the industry due to the unique nature of its work. At its core, the company's mission is to demystify and celebrate alternative sexualities by providing the most authentic kinky experiences. In order to maintain its stature and purpose, Cybernet is extremely protective of how the company and its works are presented to fans and to the public. Cybernet is also protective of how its business relationships reflect on and present the company and its products. *Decl. P. Acworth,* p 3, ¶ 12.

Cybernet is the producer, distributor, and exclusive licensor of its own motion pictures in the United States. Cybernet is engaged in the business of producing, distributing, and/or licensing to others, the rights to copy, distribute, transmit and exhibit copyrighted motion pictures and/or other audio visual works. Cybernet expends significant amounts of time, money and other resources to produce high quality products, develop supply chains and distribution systems, and build premium brand recognition of their products. Cybernet, either directly or through its affiliates or licensees, distributes its copyrighted works in various forms over the Internet, pay-per-view, video on demand, download, and digital video discs (DVD's) by selling them directly to the home viewing market or licensing others to do so. *Decl. P. Acworth,* p 4, ¶ 14-15.

Cybernet's highly sought after intellectual property is distributed on a wide range of platforms around the globe, including pay-per-view satellite television, internet and mobile

2

devices.  Cybernet has registered with the United States Copyright Office its copyrighted works. Industry standard steps were and are taken to mark and identify Cybernet's products, including placing recorded warnings at the beginning and end of video productions that appear whenever those videos are played.  The videos are watermarked with *Cybernet's* readily identifiable logos, such as the red stylized "K" on a black background, and many begin with a very recognizable opening scene of the famous Armory where the company is located.  *Decl. P. Acworth,* p 3-4, ¶¶ 8-13.

Websites that infringe Cybernets' copyrights and trademarks and provide free access to Cybernet videos are in direct competition with Cybernet's web properties.  Further, the free access to the videos reduces the value of Cybernet products and licensing agreements, and causes significant confusion through their representation of the trademarks.  In addition to Cybernet's own websites, Cybernet licenses, for a fee, its videos to major satellite provides around the world for display on paid satellite television stations – available to users that pay for access.  With Cybernet videos available for free on infringing websites, users are less likely to pay membership at websites licensed to display the videos or pay satellite television services for such access.  Accordingly, the value of Cybernet's licenses is *significantly* reduced with the availability of the videos for free on infringing sites.  The infringement of Cybernet's copyright and trademark through the public display of its videos for free has a significant impact on Cybernet's business, reputation, brand, and its counterproductive to all that the company does and presents.  *Decl. P. Acworth,* p 3-4, ¶ 16.

## B.     Defendant's Websites and Copyright Infringement

Defendant Igor Gens owns and operates two companies, International Media Ltd. and IG Media Inc.  Mr. Gens and his companies own and operate the Internet websites YouJizz.com, JizzHut.com, JizzOnline.com, OnlyJizz.com, JizzBo.com, HotFunHouse.com, and MoviesGuy.com, each displaying free lengthy adult videos, most of which are illegally displayed.  *Declaration of Jason Tucker In Support of Motion for Temporary Restraining Order*

1   *("Decl. J. Tucker")*, p 2, ¶ 9.

2       At the inception of this lawsuit, each of these sites enticed the user to join

3   YouJizzPremium.com.  Defendants directly financially benefits from all sales to

4   YouJizzPremium.com.  *Decl. J. Tucker,* p 6-7, ¶¶ 22-24.  Defendants' display and distribution

5   of videos are accompanied by advertisements that generate Defendants significant annual

6   revenue.  Advertisers purchase ad space on certain pages and in certain locations on the websites

7   due to the known or estimated Internet traffic that views the particular page or location.  The

8   volume of Internet traffic on such page or location is directly attributable to the quality of content

9   displayed and distributed.  Thus, the quality of the posted videos is directly responsible for the

10  revenue generated by the sale of ad space on Defendants' websites.  *Decl. J. Tucker,* p 3, ¶ 12, p

11  6, ¶ 21.

12      Defendants utilize United States based third-party payment processors, including

13  SegPay, WTS, CCBill, and Epoch.  Defendants utilize hosting services of Reflected Networks,

14  also located in the United States.  *Decl. J. Tucker,* p 4, ¶ 13.

15      Defendants have registered each website as an Internet Service Provider, and registered a

16  DMCA Agent.  Defendants present their websites as sites that permit third party video uploads,

17  presumably similar to that of the popular mainstream sites such as youtube.com.  The intended

18  implication is that the videos viewed on these websites are uploaded by a third party, not placed

19  there nor controlled by the Defendants.  This implication is a fraud.  While Defendants intend for

20  their sites to look like third party uploading sites, they are not.  Rather, a closer examination of

21  the site and displayed videos evidence that the videos are uploaded and controlled by the

22  Defendants or on behalf of the Defendants.  *Decl. J. Tucker,* pp 3-5, ¶¶ 14-17.

23      In addition to displaying the videos, Defendants allow third parties to take videos located

24  on Defendants' sites to display to other third parties on other third party websites for the purpose

25  of driving traffic back to Defendants.  Defendants have enabled this feature by providing an

26  "embed code" for every video on its site.  An internet user can copy and paste the embed code on

1   another website where the video can then be viewed.  *Decl. J. Tucker,* p 5, ¶ 18.

2        A large portion of videos available on the websites appear to be copyrighted videos that,

3   are not owned by Defendant but are owned by well-known and long-established members of the

4   adult –oriented audio -visual entertainment industry.  *Decl. J. Tucker,* p 5, ¶ 19.

5        **C.    Defendants' Infringement of Cybernet's Intellectual Property.**

6        Concerned about infringement of its copyrights and trademarks, Cybernet retained the

7   services of an infringement investigation service to search out Internet infringements.  In March

8   2012, a search of Defendant's website revealed 840 separate instances of infringement of

9   Cybernet's intellectual property.[1]  *Decl. J. Tucker,* p 3, ¶ 25, Exhibit A.  The original complaint

10  in the instant matter, filed in May 2012, asserted 420 of these separately documented instances of

11  violating Cybernet's registered copyrights and trademarks.

12       Shortly after the instant lawsuit was filed, it appeared that the Defendants removed the

13  infringing videos from their websites.  However, in the fall of 2012, these videos were once

14  again displayed on Defendants' websites.  Accordingly, in December 2012, Cybernet sent

15  Defendants' DMCA Registered Agent 840 DMCA compliant take-down notices – one for each

16  of the infringing videos discovered on each of Defendants' websites.[2]  *Decl. J. Tucker,* pp 7-8, ¶¶

17  26-28, Exhibit B & C.

18       Subsequent to the service of the DMCA take-down notices in December 2012, it was

19  _____

20  [1]  In 2009, Defendant Igor Gens signed up as a Cybernet affiliate, registering the website youjizz.com. *Declaration

21  of Yan Harewicz In Support of Motion for Temporary Restraining ORder ("Decl. Y. Harewicz"),* p2, ¶ 3.  Cybernet
    affiliates are compensated for directing Internet traffic to Cybernet sites.   Such affiliates are provide some short
    clips, 6 minutes in length at most, to use to entice users to Cybernet sites to pay to view full length movies.

22  *Declaration of Terrance Mundell,* p 3, ¶ 9.  Gens logged into his account only once – the day it was registered.
    Gens never directed any Internet traffic to Cybernet sites, and was never paid as an affiliate.  *Decl. Y. Harewicz,* p 2,

23  ¶ 4.  Youjizz.com was also registered as a Cybernet affiliate in 2009 by Chad Brachat.  This account was never
    logged into, and sent six joins into Cybernet, with none from the Defendants web sites at issue herein.  *Decl. Y.*

24  *Harewicz,* p 2, ¶ 5.  Any attempt by Defendants to assert that their unlawful infringing conduct was pursuant to their
    affiliate relationship with Cybernet is a farce.  Defendants never acted as an affiliate.  Moreover, the infringing

25  videos at issue herein are *not* the short clips provided and permitted for use by affiliates.  Any attempt by Defendants
    to assert they had permission to use Cybernet videos would be a blatant fabrication.

26  [2]  These notices were provided regardless of the fact that Defendants' registration as an Internet Service Provider is
    an obvious sham and attempt to avoid liability for their unlawful enterprise.

believed, and represented by Defendants, that Defendants had once again removed Cybernet's copyrighted videos and trademarks from the infringing web sites.   Cybernet's January 2013 review of Defendants' web sites indicated that these infringements were taken down. *Decl. J. Tucker,* p 8, ¶ 29.

However, in July 2013, it was discovered that this simply was not true.  Currently, 115 of Cybernet's videos  - videos listed in the original complaint ***and*** subject to the December 2012 take-down notices - were discovered on Defendant's web sites.  Each of these videos were and are located in the exact same URL as they were when originally discovered, as listed in the complaint, and listed in the take-down notices. *Decl. J. Tucker,* p 8, ¶ 29.

There are only two ways that the videos can be in the same URL as listed in the complaint and DMCA take-down notices.  Either the videos were never actually taken down or the URL was specifically saved for the re-posting of the video.  If the re-posted video was posted by a third party, it simply would not be possible for the video to have the same exact URL.  The video would have been assigned a new URL as the third part newly posted the video.  The re-display of the videos are willful and intentional acts by the Defendants. *Decl. J. Tucker,* p 8, ¶ 30.

Further, in July 2013, it was discovered that *another* 364 Cybernet copyrighted videos have been recently posted and displayed on Defendants' web sites.  These videos are different from the 420 listed in the original complaint in this case, and different from the 840 initially discovered infringements. *Decl. J. Tucker,* p 8-9, ¶31, Exhibit E.

### D.      Defendant's Fraudulent Transfer of Assets Outside the United States.

In conjunction with the continued and increased flagrant violation of Cybernet's U.S. copyrights, Defendants have begun to systematically move their assets outside the United States. An Internet website/business has three main assets:  the domain name, the product and customers of the site, and the monies generated through the site.  As of the date of this filing, Defendants have moved all seven of their domain names outside of the United States. *Decl. J. Tucker,* p 9, ¶ 32.

6

At the time of this lawsuit, each of Defendants' websites were registered with a U.S. based registrant through a U.S. based registration company.  As of the date of this filing, each of Defendant's websites' registrar is Eurodns S.A. and registrant is WhoisPrivacy Limited. Eurodns S.A. is a domain name registrar located in Luxembourg.  WhoisPrivacy Limited is a privacy registrant – used to hide the identity of an actual owner of a domain - located in Hong Kong, a known location for significant piracy.  *Decl. J. Tucker,* p 9, ¶ 33.

The following is a graphical representation of the movement of Defendant's domain names outside the United States:

| Site | Original Registrant/Registrar | Current Registrant/Registrar |
|------|------|------|
| Youjizz.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Onlyjizz.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com    (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Jizzonline.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Jizzhut.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Jizzbo.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Hotfunhouse.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |
| Moviesguy.com | ByProxy LLC (U.S. Based)<br>GoDaddy.com (U.S. Based) | WhoIsPrivacy Ltd. (Hong Kong)<br>Eurodns S.A. |

*Decl. J. Tucker,* p 9-11, ¶¶ 34-49, Exhibits F-T.

While the timing of the transfer of most of the domain names outside the Unites States is only known to have occurred since the inception of the litigation, it is known that the transfer of moviesguy.com occurred on August 8 or August 9, 2013.  *Decl. J. Tucker,* p 11, ¶¶ 48-49, Exhibits s, T.29.

The movement of domain names outside the country is a significant movement and

7

transfer of assets.  Domain names are a significant and valuable asset.  Some of the most popular domain names have sold for significant monies.  For instance:  Insure.com sold in 2009 for $16 million; Sex.com sold in 2006 for $12-$14 million; and Porn.com sold in 2007 for $9.5 million. Recently, in 2013, 114.com sold for $2.1 million; and mathgames.com sold for $725,000.  *Decl. J. Tucker,* p 11-12, ¶ 50, Exhibits U, V, X, and Y.

Other entities in Defendants' position have also attempted to move domain assets outside the country, and then move monetary assets outside the country.  In *Liberty Media Holdings v. Oron,* Cause No. 2:12-cv-01057, District of Nevada, the Court issued a temporary restraining order when plaintiff established that the defendant was moving its domain name and monetary assets into Hong Kong.  In *Datatech v. FF Magnet,* Cause No. 3:12-cv-04500, Northern District of California, the trial court also issued a temporary restraining order due to the defendant's movement of assets to Hong Kong.  In *Fraserside v. Dr. Tuber,* Cause No. 12-cv-60931, Southern District of Florida, while the case settled and no motion for temporary restraining order was filed, the defendant transferred the domain names outside the United States while litigation was going on.[3]  *Decl. J. Tucker,* p 12, ¶ 51; *Req. for Jud. Not.,* Ex A-D.

Defendants have ramped up their activities infringing Cybernet's copyrights and trademarks.  Simultaneously, Defendants have begun to move their assets outside the United States, outside the reach of United States Courts.

### III.   ARGUMENT

Copyright infringement must not be allowed to serve as the cornerstone of a profitable business.  *Playboy Enterprise, Inc. v. Webbworld, Inc.,* 991 F.Supp. 543, 561 (N.D. Tex 1997). The purpose of the penalty provisions of the Copyright Act is to "discourage wrongful infringement as well as to compensate the copyright owner."  *Miller v. Universal City Studios,*

---

[3]  The defendants in those cases are connected to each other and the instant matter through the same defense counsel.

*Inc.,* 650 F.2d 1365, 1376 (5th Cir 1981), *citing F.W. Wollworth Company v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed.2d 268 (1952).  Neither purpose can be served if the Court fails to issue the order requested herein.

If the Defendants can continue to display Cybernet's copyrighted works and trademarks regardless of the numerous DMCA compliant take-down notices and this litigation while shifting all assets and proceeds from the copyright infringement overseas to offshore accounts and entities, they will continue to enjoy a profitable business while the litigation slowly moves forward.  Quite simply, United States law and its legal system will be effectively neutralized and rendered wholly irrelevant to intellectual property thieves if this is permitted to continue.

Under the Copyright Act, Cybernet is entitled to the equitable relief of the seizure of Defendants' profits.  17 U.S.C. § 504.  Cybernet is also entitled to injunctive relief to restrain or prevent infringement.  17 U.S.C. § 502.  In the instant matter, such equity will never be realized if the Defendants are permitted to move property and profits out of the United States and if they are permitted to continue earning money in the United States, from U.S. citizens and customers, only to direct the funds to offshore locations where this Court's equitable powers lack potency.

Court's routinely issue preliminary injunctions freezing assets in circumstances like this one. *See, e.g., Pashaian v. Eccelston Properties, Ltd.,* 88 F.3d 77, 86-87 (2nd Cir. 1996); *Hendricks v. Bank of Am., N.A.,* 408 F.3d 1127, 1141 (9th Cir. 2005).  They are also issued when equity will be frustrated in the absence of the order.  *In re Estate of Ferdinand Marcos,* 25 F.3d 1467, 1480 (9th Cir. 1994).

A preliminary injunction is appropriate where a plaintiff demonstrates (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of a preliminary injunctive relief, (3) the balancing of equities tips in favor of injunctive relief, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Counsel, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1127 (9th Cir. 2009).  The requirements of proving likelihood of success on the merits and irreparable harm

9

represent two points on a sliding scale, in which the required degree of irreparable harm increases as the probability of success decreases. *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,* 204 F.3f 867, 874 (9th Cir. 2000).

Injunctive relief to prevent copyright infringement is available under the Copyright Act as an equitable remedy in the court's discretion. 17 U.S.C. § 502(a); *Flexible Lifeline Systems, Inc., v. Precision Lift, Inc.,* 654 F.3d 989, 994 (2011).

### A.    Plaintiff Is Likely To Succeed On The Merits.

Plaintiffs must satisfy two requirements in order to establish a prima facie case of direct infringement: (1) show ownership of the infringed material; and (2) demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. 17 U.S.C. § 501(a); *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1149 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir. 2001); *Baxter v. MCA, Inc.,* 812 F.2d 421, 423 (9th Cir. 1987); *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n. 3 (9th Cir 1989). Direct infringement does not require intent or any particular state of mind. *Religious Tech. Ctr. V. Netcom On-Line Commc'n Servs.,* 907 F.Supp. 1361, 1367 (N.D. Cal. 1995).

Copyright Registration for work creates rebuttable presumption that plaintiff's copyright in the work is valid. 17 U.S.C. § 410(c); *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1217 (9th Cir. 1007), *cert denied,* 523 U.S. 1021, 118 S.Ct. 1302, 140 L.Ed.2d 468 (1998).

A website, even one claiming to be a service provider, infringes upon a copyright holder's exclusive right to display its works when the website stores copies of the infringing material and communicates copies of the material to users. *Perfect 10 v. Amazon,* 508 F.3d at 1160.

In the instant matter, it is undisputed that Cybernet holds the exclusive copyright to each of the 420 videos stated in the complaint, including the 115 videos that have been discovered to have been re-posted, and the 357 videos recently discovered on Defendants' web sites.

1    It is undisputed that Defendants' websites store copies of Cybernet's videos and

2    communicates them to users of Defendants' websites.

3        It is also undisputed that Defendants have directly violated Cybernet's copyright and

4    trademarks.  Equally clear is that the Defendants cannot hide behind DMCA safe harbor

5    protections.

6        Defendants claim to be an Internet Service Provider (ISP) pursuant to the Digital

7    Millennium Copyright Act (DMCA) and afforded the safe harbor protections provided therein.

8    These safe harbor provisions shield a service provider from financial liability for infringing

9    activity on its network.  17 U.S.C. § 512(c).  To receive these safe harbor protections, upon

10   notification of claimed infringement, the service provider must expeditiously remove or disable

11   access to the infringing material.  17 U.S.C. §512(c)(1)(C).

12       Whether the Defendants are a valid ISP under the DMCA, they directly financially

13   benefitted from the infringing material, or they had actual specific knowledge of the infringing

14   material when initially displayed matters not at this point.  Defendants have, on their own,

15   negated and defeated any argument they could have for DMCA safe harbor protections.

16   Defendants have failed to properly and expeditiously remove and/or disable access to infringing

17   material.

18       In May 2012, a complaint was filed specifically listing 420 infringements.  The infringing

19   material was taken down, only to be re-posted.  In December 2012, take-down notices were sent

20   to the Defendant's DCMA Agent.  It was believed shortly thereafter that the infringing material

21   was taken down.  Currently, at least 115 of the infringing videos on each of their seven websites

22   are located in the exact same URL as they were when the Defendants were noticed to take them

23   down.  Plain and simple, they were never removed and access to them is not disabled.

24       The fact that Defendants have permitted the current posting of the 115 videos in the exact

25   URL location negates any safe harbor protection arguably asserted by Defendants.

26       Cybernet has established a strong likelihood to succeed on the merits.

11

1

**B.     Plaintiff Is Likely To Suffer Irreparable Harm In Absence of Preliminary Injunction Relief.**

2

A party seeking preliminary injunction is required to "establish that he is likely to suffer

3

irreparable hard in absence of preliminary relief." *Winter*, 555 U.S. 7, 129 S.Ct. at 374.

4

Irreparable harm exists where in the absence of equitable relief, there is a substantial chance that

5

upon final resolution, the movant cannot be made whole. *Brenntag Int'l Chems., Inc. v. Bank of*

6

*India,* 175 F.3d 245, 249 (2nd Cir. 1999).

7

A district court had authority to issue preliminary injunction relief where a plaintiff can

8

establish that a defendant has engaged in a pattern of secreting or dissipating assets to avoid

9

judgment or that money damages will be an inadequate remedy. *Marcos,* 25 F.3d at 1480.  If a

10

parties is likely to take actions that will frustrate a judgment, then the movant's irreparable harm

11

is shown. *Signal Capital Corp. v. Frank,* 895 F.Supp. 62, 54 (S.D.N.Y. 1995).  While monetary

12

damages are available at law in copyright cases, equity compels an impoundment of the

13

instrumentalities of and the proceeds from infringing activities.  17 U.S.C. § 504.

14

Copyright holders have the exclusive right to decide when, where, to whom, and for how

15

much the will authorize their copyrighted works.  *Warner Bros. Entertainment, Inc. v. WTC*

16

*Systems, Inc.,* 824 F.Supp2d 1003, 1012 (C.D. Cal. 2011); *Metro-Goldwyn-Mayer Studios, Inc.*

17

*v. Grokster, Ltd.,* 518 F.Supp2d 1197, 1218 (C.D.Cal. 2007).

18

When a defendant operates in transmitting copyrighted works in violation of copyrights

19

and without ay license, there is an interference with the grant of exclusive licenses and a

20

copyright holder's ability to negotiate licensing agreements in the future damages the copyright

21

holder's relationships, goodwill development of their license, and their overall ability to control

22

the use of and transmission of their copyrighted works.  Such interference is irreparable harm

23

sufficient to warrant injunctive relief.  *Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.,*

24

824 F.Supp2d 1003, 1012 (C.D. Cal. 2011).

25

The loss of control of use of copyright works where defendants had and continue to

26

induce more infringement than could possibly be redressed with damages is irreparable harm sufficient to warrant injunction relief.  *Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.,* 824 F.Supp2d 1003, 1012 (C.D. Cal. 2011); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp2d 1197, 1218 (C.D.Cal. 2007).

When a defendant exploits a copyrighted works without paying normal licensing fees such that they deprive the copyright holder of revenue and jeopardize the continued existence of the copyright holder's licensees' businesses, this also establishes irreparable harm sufficient to warrant injunctive relief.  *Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.,* 824 F.Supp2d 1003, 1012 (C.D. Cal. 2011).

Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable nor easily compensable.  *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1066 (N.D.Cal. 2000).  If the infringement threatens the development of a successful and lawful video on demand market, and can confuse consumers about whether payment is required for access to the copyrighted works, there is the likelihood of irreparable harm sufficient for injunction relief.  *Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.,* 824 F.Supp2d 1003, 1012 (C.D. Cal. 2011); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp2d 1197, 1218 (C.D.Cal. 2007).

The financial impact of copyright infringement is hard to measure and often involved intangible qualities such as customer goodwill.  *Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1288-89 (10th Cir. 1996).  When irreparable economic damages are difficult to calculate, a finding of irreparable harm is appropriate.  *Lakedreams v. Taylor,* 932 F.2d 1103, 1109 (5th Cir. 1991).

In recent months, Defendants have systematically moved each of their seven web sites offshore, outside the United States.  Each of their seven domain names have been moved to Eurodns and the privacy protection service for each web site has been moved to Hong Kong. The most recent move was of Defendants' web site movieguys.com – which was moved on

13

August 8, 2013.  These actions pattern exactly the actions of the Defendants in *Liberty Media Holdings v. Oron,* Cause No. 2:12-cv-01057, District of Nevada, *Datatech v. FF Magnet,* Cause No. 3:12-cv-04500, Northern District of California, and *Fraserside v. Dr. Tuber,* Cause No. 12-cv-60931, Southern District of Florida, cases of identical subject matter and actions by the Defendants to the instant one.  In each of those cases, the court imposed a temporary restraining order before the defendants could move their financial accounts overseas.

The very serious threat in the instant matter is that the Defendants are preparing to move their U.S. based financial accounts offshore and out of reach of the U.S. Courts.  The transfer of assets offshore irreparably harms Cybernet, as it renders the collection of any judgment nearly impossible and it renders any equitable relief obtained under the Copyright Act wholly ineffective.

Defendants' actions in continuing to infringe Cybernet's copyrighted works and trademarks is significantly damaging Cybernet's goodwill and the value of its licenses.  As of the date of this motion, Defendants are committing nearly 500 acts of infringement of Cybernet's copyrighted movies.  In addition to these specific acts of infringement, Defendants are providing embedded code for Cybernet's movies to Defendants' viewers – allowing them to repeatedly display Cybernet's movies in unknown locations and unknown quantities.

Defendant's actions renders Cybernet absolutely powerless over the location of display and manner of display of its movies.  Such lack of control damages Cybernet's goodwill and the value of Cybernet's licenses to an unquantifiable degree.

Defendants' systematic transfer of assets overseas irreparably harms Cybernet in the enforcement of this intellectual property litigation.  Defendants' continued and blatant infringement of Cybernet's movies and trademarks irreparably damages Cybernet's place and value in the market place.

**C.    Balance of Equities Tips In Favor of Injunctive Relief.**

14

1   An injunction may not issue unless the balance of hardships tips sharply in favor of the

2   moving party.  *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir.

3   1993).  Possibility that defendant's business would not survive in the face of a preliminary

4   injunction does not justify the denial of a preliminary injunction on the grounds that balance of

5   hardships tipped in favor of defendant where plaintiff showed strong likelihood of success on

6   merits of copyright infringement claim.  *Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d

7   824, 829 (1997).

8   The requested temporary restraining order is limited in scope.  The requested order does

9   nothing more than prohibit Defendant from fraudulent transfers and prohibited Defendants from

10  displaying Cybernet's copyrighted works and trademarks, each of which Defendants have no

11  lawful authority to display.

12  An injunction would prohibit Defendants from using Cybernet's copyrighted works,

13  works for which they have not obtained permission or license to use.  The only potential

14  hardship that Defendants could assert for not being able to use Cybernet's copyrighted works

15  would be the loss of revenue generated from the display and distribution of the works.  This is

16  insufficient to tip the balance of equities in favor of denial of injunctive relief.

17  Given the extreme prejudice and harm caused to Cybernet by the Defendant's display and

18  distribution of Cybernet's movies for free, the balance of equities tips sharply in favor of

19  injunctive relief.  Additionally, Defendants have legal counsel.  As soon as assets are frozen,

20  Defendants can be notified and a hearing can be held at the first opportunity suitable for the court

21  and Defendants.

22  **D.    A Temporary Restraining Order and Injunctive Relief Is In The Public**
23  **Interest.**

24  The public interest analysis for the issuance of a preliminary injunction requires the court

25  to consider whether there exists some critical public interest that would be injured by the grant of

26  preliminary relief.  *Independent Living Center of Southern California, Inc. v. Maxwell-Jolly,* 572

15

F.3d 644, 659 (9th Cir. 2009).  When the reach of an injunction is narrow and limited only to the parties to the lawsuit, without impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction. *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138-39 (9th Cir. 2009).  If the impact of an injunction reached beyond the parties, carrying with it a potential for public consequence, the public interest will be relevant to whether the court grants the preliminary injunction. *Id.*

The plaintiff bears the initial burden of showing that the issuance of the injunction is in the public interest.  *Winter,* 129 S.Ct. at 378, *Stormans,* 586 F.3d at 1139.  The court need not consider public consequences that are highly speculative.  The court should weigh the public interest in light of the likely consequences of the injunction.  *Stormans,* 586 F.3d at 1139.

In the context of copyright infringement, it is "virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work."  *Warner Bros. Entertainment, Inc. v. WTC Systems, Inc.,* 824 F.Supp2d 1003, 1012 (C.D. Cal. 2011), *citing Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3rd Cir. 1983).

Further, in the context of adult entertainment on-line, the industry is highly regulated, with stringent record keeping requirements for those that display such materials.  ***Age verifications efforts – cybernet takes seriously.***  It is certainly in the public interest to ensure that those displaying adult content have license to do so – as that will ease the assurance that all regulations and record keeping requirements are met.

A temporary restraining order will further the public interest in enforcing federal law and protecting copyrights from piracy, and keeping flagrant copyright thieves from evading responsibility for their unlawful and damaging actions.

  **E.**  ***Ex Parte* Relief Is Essential.**

Fed. R. Civ. Proc. 65 permits issuance of a temporary restraining order without prior notice to Defendants.  A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required.

An *ex parte* order preserves the *status quo* and prevents irreparable harm.  *Granny Goose Foods, Inc., et al. v. Brotherhood of Teamsters,* 415 U.S. 423, 439 (1974).  Courts grant a temporary restraining order when: (1) immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party can be heard in opposition; and (2) the applicant sufficiently demonstrates the reason notice should not be required.  Numerous courts recognized the need for *ex parte* temporary restraining orders in intellectual property cases. *Vuitton v. White,* 945 F.2d 569 (3d Cir. 1991); *NBA Properties v. Various John Does,* 113 F.3d 1246 (10th Cir. 1997), *dec'n without published opinion, reported in fill at* 1997 U.S. App. LEX1S 11946 (10th Cir. 1997); *American Can Company v. Mansukhani,* 742 F.2d 314, 321 (7th Cir. 1984) (holding Rule 65 "expressly contemplates the issuance of *ex parte* temporary restraining orders").

Regarding the issuance of temporary restraining orders, the Second Circuit Court of Appeals issued a writ of mandamus ordering the district court grant *ex parte* relief:

> The ex parte temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief. Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened. In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief

17

at all. *Id.* at 4, quoting *Developments In The Law — Injunctions,* 78 Harv. L. Rev. 994, 1060 (1965); See also, *Fimab-Finanziaria MaglificioBiellese Fratelli Fila S.P.A. v, Kitchen,* 548 F. Supp. 2487, 249-250 (S.1). Fla. 1982) (recognizing the need for *ex parte* restraining orders in infringement cases and citing numerous unpublished orders granting such relief).

*Vuitton Et Fils S.A.,* 606 F.2d 1 (2d Cir. 1991). The Court further explained:

> [a]ssuming that all of the other requirements of Rule 65 are met, the rule by its very terms allows for the issuance of an *ex parte* temporary restraining order when (1) the failure to issue it would result in "immediate and irreparable injury, loss, or damage" and (2) the applicant sufficiently demonstrates the reason that notice "should not be required." In a trademark infringement case such as this, a substantial likelihood of confusion constitutes, in and of itself, irreparable injury sufficient to satisfy the requirements of Rule 65(b)( 1) .

To obtain *ex parte* relief, *a* "Plaintiff need not show that a particular Defendant would not adhere to a temporary restraining order, but rather only that someone like the defendant would be likely to hide or destroy the evidence of his infringing activity." *Century Home Entertainment, Inc. v. Laser Beat, Inc.,* 859 F.Supp. 636, 638 (E.D.N.Y. 1994) (citing *In The Matter Of Vuitton, cited supra).* In this case, U.S. based assets *are* being spirited offshore; Defendants have *already* engaged in fraudulent transfers. Consistent with other similarly situated defendants and infringers.

Plaintiff has substantial equitable remedies awaiting them. 17 U.S.C. § 502-505. However, remedial and legal relief is unavailable if Defendants remove all property and funds subject to Plaintiff's recovery beyond the reach of the Court. Prior notice would "render fruitless further prosecution of the action." *Vuitton. cited supra,* 606 F.2d at 5.

Courts grant Rule 65(b) *ex parte* injunctive relief in two situations: (1) a showing that notice is impossible because plaintiff in unaware of the defendant's identity or location; or, (2) a showing that proceeding *ex parte* is the only method by which the court can fashion effective final relief. *See In The Matter 01 Vuitton,* 606 F.2d at 4. To justify *ex parte* proceedings under situation (2) above, the movant must show: (1) the adverse party

18

historically disposes of evidence or violates court orders; or (2) that persons similar to the adverse party have such a history. *See First Technology Safety Systems, Inc. v. Depinet,* 11 F.3d 641. 651 (6th Cir. 1998); *Vector Research v. Howard & Howard Attorneys, P.C.* 1996 U.S. App. LEXIS 7492 (6th Cir. 1996).

When giving notice to the defendants will result in the dumping of goods or other nefarious deeds, it is appropriate to issue *ex parte* orders without notice. *Fimab-Finanziaria MaglificioBiellese Fratelli Fila S.P.A. v. Kitchen,* 548 F.Supp. 248, 249 (S.D. Fla. 1982); *see also Vuitton.* 606 F.2d at 23. *Ex parte* relief is sometimes the only effective tool for combating intellectual property theft when the defendants are overseas acting dishonestly. *See, e.g. Reebok International, Inc. v. Marnatech Enterterprises, Inc.,* 970 F.2d 522 (9th Cir. 1992); *Vuitton v. White,* F.2d 569, 571-72 (3d Cir. 1991). That is exactly what will happen here. Plaintiff is entitled to issuance of an *ex parte* temporary restraining order. It is the only method of preserving the status quo because Defendants have already taken affirmative steps to move assets beyond the Court's reach in order to frustrate any order the court may issue.

A TRO is appropriate. Defendants' willful infringements and fraudulent transfers of assets make it critical that the Court order seizure before Defendants completely dissipate their funds and completely transfer their assets. Additionally, where danger of destruction or hiding evidence exists, the federal rules permit issuance of *ex parte* seizure and impoundment orders, and this is the kind of situation that the rule was intended to address. *See, Universal City Studios, Inc. v. Ronnie Lorizzo,* 9:03-CV-5182(SJ) (E.D.N.Y. Nov. 17, 1993); *See also, The Walt Disney Company, v. Jim Garofalo,* 9:02-CV-5314 (E.D.N.Y. Nov. 12, 1992).

Once the funds Defendants of illicit profits are frozen and therefore the Court is assured it can provide the equitable disgorgement relief allowed under the Copyright Act, Defendants can be located through the counsel they have engaged and a full hearing on the issues may be scheduled, but to provide notice in advance is to invite Defendants to move their remaining funds and assets off shore and shut the door to any possible relief at all.

1

**F.     Cybernet Will Provide Adequate Security If Hardship Is Proven.**

2

   In the event that the Defendants *prove* hardship, they may propose a bond to be posted by

3

Cybernet.  Defendant, however, bears the burden of actually proving hardship – not just alleging

4

it.  *Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir.

5

2003) (in an asset freeze injunction, the bond amount may be zero if there is no evidence the

6

party will suffer damages from the injunction.)

7

   In the instant matter, the likelihood of harm to the Defendants extremely small, if at all.

8

The entry of the requested order would be the same as an order preventing a thief from

9

continuing to steal and freezing the monies he had made from his past thefts.  A bond is neither

10

necessary nor proper in the case.  However, should the Court be inclined to entertain a request

11

for a bond, there should be an evidentiary hearing for the Defendants to establish hardship.  A

12

mere request for a bond, without sworn testimony specifically stating the actual harm and an

13

opportunity to cross-examine witnesses regarding such hard, should not suffice.

14

**G.     Defendants Should Be Ordered To Show Cause Regarding The Issuance of A
        Preliminary Injunction.**

15

16

   The standard for issuance of a preliminary injunction is equal to the standard for

17

issuance of a temporary restraining order.  *Speaks v. Kruse,* 445 F.3d 396, 399-400 (5th Cir.

18

2006).  Cybernet has met the burden required for the issuance of a preliminary injunction in

19

this matter.  The Court should issue a show-cause order requiring the Defendants to

20

demonstrate and set forth reasons why the Court should not issue a preliminary injunction

21

continuing the relief granted in the temporary restraining order.

22

**IV.     CONCLUSION**

23

24

   Defendants have illegally displayed and distributed unauthorized copies of Cybernet's

25

copyrighted works.  After the filing of this lawsuit and service of numerous DMCA compliant

26

take-down notices, Defendants continue to violate Cybernet's copyright and trademarks.

1  Moreover, the Defendants have systematically begun to transfer their assets outside the United

2  States.  The Court should grant Cybernet's motion for a temporary restraining order, ore for

3  seizure, and order to show cause.   The Court should grant these requests *ex parte* and without

4  advance notice to Defendants to preserve the *status quo* and permit the Court to fashion effect

5  relief at trial.

6

7       Dated September 3, 2013.

8

9                                    Respectfully submitted,

10

11                                    __/s/ Spencer D. Freeman_____
12                                    Spencer D. Freeman
                                      Freeman Law Firm, Inc.
13                                    Attorney for Plaintiff Cybernet Entertainment LLC

14

15

16

17

18

19

20

21

22

23

24

25

26