Chad L. Belville, AZ Bar 020771
Attorney for Plaintiff Cybernet Entertainment.
4742 N. 24th Street, Suite 315
Phoenix, AZ 85016
Telephone: (602) 904-5485
Facsimile:  (602) 291-6953
Email: cbelville@azbar.org

Spencer D. Freeman, WSBA#25069
Attorney for Plaintiff Cybernet Entertainment.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
Telephone: (253) 383-4500
Facsimile:  (253) 383-4501
Email: sfreeman@freemanlawfirm.org
(Pro Hac Vice)

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| CYBERNET ENTERTAINMENT, LLC, a New York Company,<br><br>Plaintiff,<br><br>vs.<br><br>IG MEDIA INC., et al.,<br><br>Defendants. | Case No.:  2:12-cv-01101 SRB<br><br>**DECLARATION OF JASON TUCKER IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Jason Tucker, declare:

- 1 -

1. I am a United States Citizen, over the age of 18 years old, make this declaration based upon personal knowledge and, if called to testify could and would testify competently to the facts set forth herein.

2. I am a Director of Battleship Stance LLC, a leading intellectual property management and anti-piracy enforcement company. I have been and serve as a consultant and Enforcement Officer for major award winning entertainment studios including the publicly traded Private Media Groups' Fraserside IP LLC, Wicked Pictures, Channel One Communications, Cybernet Entertainment d/b/a Kink.com, and Zero Tolerance Entertainment, Third Degree Films, Black Ice Limited and others.

3. I have been involved in the industry of legal adult erotic entertainment production, marketing and management at an executive level for over ten (10) years, serving over six years as President of a company that owns and licenses one of the world's largest erotic libraries of images.

4. I have been involved in over 50 copyright infringement cases serving in most as an expert witness including most recently Liberty Media Holding LLC v. FF Magnat Limited b/d/a/ Oron.com, District of Nevada Cause No. 2:12-cv-1057.

5. As an Adult Industry Executive, I have been quoted or featured in publications including Newsweek, BusinessWeek, USA Today, Wired, and the Washington Post and frequently speak on panels and seminars at industry events on various industry related topics, but specifically on internet piracy, copyright and trademark infringement and content protection.

6. I have created, purchased, managed and operated paid membership websites, free sites, affiliate programs, and sold over US $1 Million Dollars in top-level adult domain names such as Erotica.com, SexSlaves.com and Wetdreams.com.

7. I have made myself familiar with the corporate structure of Cybernet Entertainment. I have made myself familiar with the company methods, procedures, production and ownership of their copyrighted and trademarked materials. I have been, on multiple

-2-

occasions, to their headquarters and seen their production facilities and all areas of their production operations first hand.

8. I have reviewed and documented and/or supervised the review and documentation of the evidence of infringement committed by Defendants outlined in the Complaint, and of those infringements not specifically alleged in the Complaint.

9. I have reviewed and made myself familiar with Defendants' web sites at issue in the case, including YouJizz.com, JizzHut.com, JizzOnline.com, OnlyJizz.com, JizzBo.com, HotFunHouse.com, and MoviesGuy.com, each displaying free lengthy adult videos, most of which are illegally displayed.

10. The websites at issue in this case have a significant number of viewers. For instance, the YouJizz.com website is visited by over 5 million internet surfers per month. Alexa.com, the leading provider of web metrics, ranks the YouJizz.com website as the #162 most visited website in the world. As a matter of comparison as to the magnitude of the size for the sites at issue, Alexa.com ranks NFL.com at #903, ESPN at #111, WebMD.com at #385, and Disney.com at #555.

11. These enormous numbers of visitors result in Cybernet's copyrighted works individually being viewed thousands or even hundreds of thousands of times on Defendant's website.

12. Each of these sites enticed the user to join YouJizzPremium.com. Defendants directly financially benefit from all sales to YouJizzPremium.com on a recurring paid membership model. Further, Defendants sell advertising space on each page of each website. The value of the advertising space is directly attributable to the value of the content displayed on the page. Quite simply, there more desirable that the content is to the end user, the more valuable to advertising space.

1 one Defendant website, the other Defendant websites will draw upon and use that data to create unique pages to display the video. Therefore, Defendant may claim a video is user uploaded for one website, but the other websites are not displaying user-uploaded content – rather those websites are sourcing their videos independently of the user. With full knowledge of their actions, Defendants are intentionally creating unique, search engine optimized web pages on completely separate websites for the purpose of gaining top placement in search engines for the purpose of earning revenue by utilizing the display and distribution of Plaintiff's videos without any license from the rightful owner. If one were to take the URL of a video located on one of Defendants' sites, and change the site name in the URL to that of one of Defendants' other sites, the browser would be directed to the newly inputted Defendant site and that same video is displayed on the site. Therefore, the exact same video is located at the exact same location on each of Defendant's sites. If the video were truly a third party upload – the upload would be just on the one site. Instead, the video is located on centralized servers that are controlled by Defendants and displayed on all of Defendants' sites. The only conclusion is that Defendant loads the videos on its servers for display on all of their sites.

18. Defendants allow third parties to take videos located on Defendants' sites to display to other third parties on other third party websites for the purpose of driving traffic (end users) back to Defendants. Defendants have enabled this feature by providing an "embed code" for every video on its *site*. An internet user can copy and paste the embed code on another website where the video can then be viewed. The result of this action creates an uncontrollable virus like experience that allows content to be replicated en mass around the internet. Using that same example, we have identified that patient zero is the Defendant but we cannot stop the spread of the virus like experience created by allowing embedding.

19. A large portion of videos available on the websites appear to be copyrighted videos that, are not owned by Defendant but are owned by well-known and long-established

members of the adult –oriented audio -visual entertainment industry. We have recently discovered over 2000 infringing videos on Defendants websites for our other clients.

20. So severe is Defendants' piracy that they have been censored by certain ISP's. As a solution aka work around, the United Kingdom company Immunicity found it necessary to state that by using their services you can "bypass" the block. (Source: https://immunicity.org/howitworks and https://immunicity.org/blockedsites).

21. Defendants' display and distribution of videos are accompanied by advertisements that generate Defendants significant annual revenue. Advertisers purchase ad space on certain pages and in certain locations on the websites due to the known or estimated Internet traffic that views the particular page or location. The volume of Internet traffic on such page or location is directly attributable to the quality of content displayed and distributed. Thus, the quality of the posted videos is directly responsible for the revenue generated by the sale of ad space on Defendants' websites.

22. Defendants' financial benefit from infringing material is not limited to the large revenues generated through sale of third party advertising space. As opposed to legitimate user generated content exchange sites, Defendants' website induced the Internet user to pay and if they choose to continue to pay subscription fees to Defendant-owned and controlled YouJizz Premium.

23. Defendants' inducement is as follows: Defendants do not initially allow users to view high quality versions of the videos or download the videos to the user's computer, although a user may *view* the films by lower quality streaming for free. At the time this lawsuit was filed, if the Internet user wished to view the film in High Definition, or download the video, the user was presented with the option of becoming a Premium Member. The various options presented to the website user included a one (1) day trial for $1.00 that converts to a recurring membership the following day, a one (1) month Premium Membership for $29.95 that renews every 30 days until cancelled, or an annual membership of $88.68. As of the date of this motion, Defendants

1  have ceased offering new Premium Memberships, but indicate that current and past members
2  subscriptions automatically renew.
3      24.    The Paid Premium Membership entices the website user to view videos in HD,
4  download the unauthorized and uncompensated copyrighted work belonging to Plaintiff, receive
5  24/7 customer support, increase download speeds, and interact with other paid subscribers; all
6  allowing Defendants to directly commercially benefit from infringed work without any benefit to
7  the copyright holder. Defendants give away unauthorized viewing of copyrighted videos and
8  then entice potential consumers with more unauthorized copies of videos without any benefit to
9  the copyright holder.
10     25.    Concerned about infringement of its copyrights and trademarks, Cybernet retained
11 the services of our infringement investigation service to search out *Internet* infringements. In
12 March 2012, a search of Defendant's website revealed 840 separate instances of infringement of
13 Cybernet's intellectual property. Attached hereto as Exhibit A is a true and correct copy of a
14 spreadsheet that lists each infringement, the exact URL location of the infringement, and the
15 relevant copyright registration. The original complaint in the instant matter was filed in May
16 2012 asserted 420 of these separately documented instances of violating Cybernet's registered
17 copyrights and trademarks.
18     26.    Shortly after the instant lawsuit was filed, it appeared that the Defendants
19 removed the infringing videos from their websites. However, in the fall of 2012, these videos
20 were once again displayed on Defendants' websites. Accordingly, in December 2012, Cybernet
21 sent Defendants' DMCA Registered Agent and their hosting company 840 DMCA compliant
22 take-down notices – one for each of the infringing videos discovered on each of Defendants'
23 websites.
24     27.    Each take down notice included the requisite elements, as evidence by one take-
25 down notice, a true and correct copy of which is attached hereto as Exhibit B. Each of the 840
26

1  take-down notices looked identical to this example, except for listing the respective infringement
2  and location.
3       28.   These takedown notices were delivered via U.S.P.S and Federal Express. The
4  delivery slips are attached hereto as Exhibit C.
5       29.   Subsequent to the service of the DMCA take-down notices in December 2012, it
6  was believed, and represented by Defendants, that Defendants had once again removed
7  Cybernet's copyrighted videos and trademarks from the infringing web sites. My January 2013
8  review of Defendants' web sites indicated that these infringements were taken down. However,
9  in July 2013, my staff and I discovered that this simply was not true. Currently, 115 of
10 Cybernet's videos - videos listed in the original complaint *and* subject to the December 2012
11 take-down notices - were discovered on Defendant's web sites. Attached hereto as Exhibit D is a
12 true and correct copy of a spreadsheet outlining each of these 115 infringements. <u>Each of these
13 videos were and are located in the exact same URL (webpages) as they were when originally
14 discovered, as listed in the complaint, and listed in the take-down notices.</u>
15      30.   There are only two ways that the videos can be in the same URL as listed in the
16 complaint and DMCA take-down notices. Either the videos were never actually taken down or
17 the URL was specifically saved for the reposting of the video. If the re-posted video was posted
18 by a third party, it simply would not be possible for the video to have the same exact URL. The
19 video would have been assigned a new URL if a third party newly posted the video just based on
20 the very nature of how the technology of the site and sites like those at issue work. A database
21 and software that gathers, accepts and post videos would not know to post a very specific video
22 to an old and supposedly dead page unless it was manually instructed to. The re-display of the
23 videos are willful and intentional acts by the Defendants.
24      31.   Further, in July 2013, we discovered that *another* additional 364 Cybernet
25 copyrighted videos have been recently posted and displayed on Defendants' web sites. These
26

1 videos are different from the 420 listed in the original complaint in this case. Attached hereto as
2 Exhibit E is a true and correct copy of a spreadsheet which states each infringement.
3       32. Defendants have begun to systematically move their assets outside the United
4 States. An Internet website/business has three main assets: the domain name, the product and
5 customers of the site, and the monies generated through the site. As of the date of this filing,
6 Defendants have moved all seven of their domain names outside of the United States.
7       33. At the time of this lawsuit, each of Defendants' websites were registered with a
8 U.S. based registrant through a U.S. based registration company. As of the date of this filing,
9 each of Defendant's websites' registrar is Eurodns S.A. and registrant is WhoisPrivacy Limited.
10 Eurodns S.A. is a domain name registrar located in Luxembourg. Most concerning is that
11 WhoisPrivacy Limited is now the privacy registrant – used to hide the identity of an actual owner
12 of a domain - located in Hong Kong, a known for location of significant piracy. Per the
13 Congressional International Anti-Piracy Caucus of 2010, "China's…markets now have become
14 contaminated with pirated materials via an array of illegal websites…that connect users to
15 infringing websites and content. Close to half of the audiovisual content available on the world's
16 "top sites" is sourced from "user - generated content" sites in China...The Chinese government
17 has made numerous bilateral commitments to address these forms of piracy." (see URL last
18 viewed on 08232013: http://www.graphic-
19 design.com/news/congress/2010_IAPC_Watch_List.pdf). Three years later, similar statements
20 are in their additional reports.
21       34. Domaintools.com, located at the URL of the same name, has "The most
22 comprehensive WhoIs database on the planet and our proprietary technology let you gather the
23 most complete picture of a domain name you can get anywhere..." (Source:
24 http://www.domaintools.com/research/)
25
26

35. Attached hereto as Exhibit F is a true and correct copy of a domaintools.com printout from March 7, 2012 for youjizz.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States in the State of Arizona.

36. Attached hereto as Exhibit G is a true and correct copy of a domaintools.com printout from August 9, 2013 for youjizz.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

37. Attached hereto as Exhibit H is a true and correct copy of a domaintools.com printout from March 7, 2012 for onlyjizz.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

38. Attached hereto as Exhibit I is a true and correct copy of a domaintools.com printout from August 9, 2013 for onlyjizz.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

39. Attached hereto as Exhibit J is a true and correct copy of a domaintools.com printout from March 7, 2012 for jizzonline.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

40. Attached hereto as Exhibit K is a true and correct copy of a domaintools.com printout from August 9, 2013 for jizzonline.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

41. Attached hereto as Exhibit L is a true and correct copy of a domaintools.com printout from March 7, 2012 for jizzhut.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

42. Attached hereto as Exhibit M is a true and correct copy of a domaintools.com printout from August 9, 2013 for jizzhut.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

43. Attached hereto as Exhibit N is a true and correct copy of a domaintools.com printout from March 7, 2012 for jizzbo.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

44. Attached hereto as Exhibit O is a true and correct copy of a domaintools.com printout from August 9, 2013 for jizzbo.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

45. Attached hereto as Exhibit P is a true and correct copy of a domaintools.com printout from March 7, 2012 for hotfunhouse.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

46. Attached hereto as Exhibit Q is a true and correct copy of a domaintools.com printout from August 9, 2013 for hotfunhouse.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

47. Attached hereto as Exhibit R is a true and correct copy of a domaintools.com printout from March 7, 2012 for moviesguys.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

48. Attached hereto as Exhibit S is a true and correct copy of a domaintools.com printout from August 7, 2013 for moviesguys.com showing that the registrar was GoDaddy and the registrant was DomainsByProxy, LLC, both based in the United States.

49. Attached hereto as Exhibit T is a true and correct copy of a domaintools.com printout from August 9, 2013 for moviesguys.com showing that the registrar is Eurodns S.A. and the registrant is WhoIsPrivacy Ltd.

50. The movement of domain names outside the country is a significant movement and transfer of assets. Domain names are a significant and valuable asset. Some of the most popular domain names have sold for significant monies. For instance: Insure.com sold in 2009 for $16 million; Sex.com sold in 2006 for $12-$14 million; and Porn.com sold in 2007 for $9.5 million. Recently, in 2013, 114.com sold for $2.1 million; mathgames.com sold for $725,000;

reverseMortgage.com sold for $600,000; brand.com sold for $500,000; and body.com sold for $380,000. Attached hereto as Exhibits U and V are Internet reporting records, substantiating each of these sales, respectively.

51. Other entities in Defendants' position have also attempted to move domain assets outside the country, and then move monetary assets outside the country. In *Liberty Media Holdings v. Oron,* Cause No. 2:12-cv-01057, District of Nevada, the Court issued a temporary restraining order after plaintiff established that the defendant was moving its domain name and monetary assets into Hong Kong. (I was consulted as an expert witness and signed a declaration in the *Liberty* case.) In *Datatech v. FF Magnet,* Cause No. 3:12-cv-04500, Northern District of California, the trial court also issued a temporary restraining order due to the defendant's movement of assets to Hong Kong. In *Fraserside v. Dr. Tuber,* Cause No. 12-cv-60931, Southern District of Florida, while the case settled and no motion for temporary restraining order was filed, the defendant transferred the domain names outside the United States while litigation was going on. (I was personally involved with the investigations in the *Fraserside* case.)

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Execute on the 3rd day of September, 2013 at Phoenix, Arizona.

_____
Jason Tucker