John P. Flynn (# 015065)
Peter J. Moolenaar (# 024487)
**DIOGUARDI FLYNN LLP**
7001 N. Scottsdale Road, Suite 2060
Scottsdale, Arizona 85253
Telephone:     (480) 951-8800
Facsimile:      (480) 951-8824
jflynn@dioguardiflynn.com
pmoolenaar@dioguardiflynn.com

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Cybernet Entertainment LLC, a New York Company<br><br>Plaintiff,<br><br>-v.-<br><br>IG Media Inc. and International Media Ltd. d/b/a YouJizz.com JizzHut.com, and JizzOnline.com and OnlyJizz.com and MoviesGuy.com and JizzBo.com and HotFunHouse.com and Igor Gens<br><br>Defendants. | Case No. 2:12-cv-01101-SPL<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Defendants IG Media Inc., International Media Ltd. (collectively "International Media") and Igor Gens, by and through undersigned counsel, pursuant to Rule 56, Fed.R.Civ.P., hereby respond to Plaintiff's Motion for Partial Summary Judgment (Doc 118) ("Cybernet's Motion").[1]   Contrary to Plaintiff Cybernet Entertainment LLC's ("Cybernet") flawed interpretation, Defendants have not admitted to posting, seven (7) months after Cybernet filed is Complaint, the 115 videos vaguely referenced in Cybernet's Motion.  Further, Defendants are protected from monetary liability for Cybernet's claims under the safe harbor

---

[1]   Cybernet's Motion (Doc 118) is erroneously titled "Plaintiff's Statement of Facts in Support of Their Motion for Partial Summary Judgment.

provisions of the Digital Millennium Copyright Act ("DMCA") and any injunctive relief would be moot since Defendants have removed the alleged infringing material.  *See* 17 U.S.C. § 512(c).

In addition, although Cybernet's Motion mentions 115 videos, it only provided copyright registrations for and identified 14 specific videos.  *See* Plaintiff's Statement of Facts in Support of their Motion for Partial Summary Judgment (Doc. 119) ¶ 26 and Declaration of Jason Tucker in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. 120).  The elements of prima facie copyright infringement claim are: (1) ownership of valid copyright, and (2) that defendant violated copyright owner's exclusive rights under Copyright Act. 17 U.S.C. § 501(a); *Ellison v. Robison*, 357 F.3d 1072, 1076 (9th Cir. 2004). Cybernet has failed to meet its burden with regard to one hundred and one (101) of the vaguely referenced videos in its Motion.  As such, Cybernet's Motion is limited solely to the fourteen (14) videos identified as exhibits to its Statement of Facts—six of which Cybernet requested International Media to upload to its websites.  Defendants' Controverting and Separate Statement of Facts in Support of their Response to Plaintiff's Motion for Partial Summary Judgment ("CSOF") ¶ 36.

## I.     <u>INTRODUCTION</u>

International Media is an internet service provider that operates the websites YouJizz.com, Jizzhut.com, Jizzonline.com, Onlyjizz.com, Jizzbo.com, Moviesguy.com, and Hotfunhouse.com (collectively the "IM Websites").  CSOF ¶ 27.   The IM Websites share a single database and allow users to view streaming adult oriented videos which are uploaded either by: (i) other users of the IM Websites or (ii) International Media's staff at the direction and with the authority of the producers of the videos.  CSOF ¶ 28.  The IM Websites are open and free of charge to anyone accessing the Internet over the age of 18.  CSOF ¶ 29.  Visitors to

D0106716/10410-001

the sites are not charged a fee to access the sites.  CSOF ¶ 30.  Similarly, individuals that upload videos or content to the websites operated by International Media are not compensated by International Media. CSOF ¶ 31.  International Media generates revenue almost entirely from selling advertising space.  CSOF ¶ 32.  International Media does not receive a financial benefit directly attributable to any alleged infringing activity on the IM Websites.  CSOF ¶ 33.  International Media has designated an agent with the United States Copyright Office in accordance with 17 U.S.C. 512(c)(2), and upon notification in accordance with 17 U.S.C. § 512(c)(3), responds expeditiously to remove or disable access to the material that is claimed to be infringing.  CSOF ¶ 34.

Cybernet's Motion is limited to 14 of the more than 2 million videos on International Media's server.  CSOF ¶ 35.  Upon International Media's receipt of the Complaint, each of the videos identified in the Complaint were disabled and quarantined.  CSOF ¶ 39.  Although a small percentage of the previously disabled videos were inadvertently and partially re-enabled for a short period of time, they were promptly removed and permanently quarantined upon notice.  CSOF ¶ 40. International Media has taken and will continue to take all reasonable steps to ensure that the identified files will not be re-enabled and that the underlying video files will not be reposted.  CSOF ¶ 41.

**A. Defendants did not Admit to Posting Cybernet's 14 Videos.**

In its Motion, Cybernet misstates that Defendants' have admitted to posting 115 separate and distinct copyright works.  Cybernet is mistaken.  Indeed, the only admission regarding these works was contained in the Declaration of Chad Brachat in Support of Defendants' Opposition to Plaintiff's Application for Temporary Restraining Order Pursuant to Fed.R.Civ.P.65 (Doc. 94) ("Brachat Declaration").  In his declaration, Mr. Brachat, an independent contractor of International Media, states that he "unintentionally and against International

D0106716/10410-001

Media's rules and procedures, re-enabled access to approximately 21 of the videos that he had previously disabled. CSOF ¶ 42. Those 21 videos were counted numerous times by Jason Tucker in his Declaration in Support of Plaintiff's Motion for Temporary Restraining Order (Doc. 87) ("Tucker Declaration") to arrive at Mr. Tucker's number of 115. CSOF ¶ 43. However, that does not change the fact that there were only 21 videos re-enabled—14 of which are at issue in Cybernet's Motion. Nor does it change the fact that none of the Defendants in this action have admitted to posting any videos related to this matter.[2] Nor did the Defendants admit that Cybernet has valid copyrights for those videos.

### i.   Chad Brachat Unintentionally Re-Enabled Access to 21 Files, Against International Media's Rules and Procedures.

It is International Media's standard operating procedure to delete from its servers files that it is notified are allegedly infringing. CSOF ¶ 44. However, in this situation where there is active litigation pending against International Media, it instead instituted a "quarantine" to limit or disable access to the allegedly infringing materials until it receives a DMCA 512(c) compliant Notice to completely remove or disable access to infringing material. CSOF ¶ 45. Following Cybernet's filing of the Complaint in this action, International media placed in "quarantine" each of the videos identified in the Complaint as being allegedly infringing. CSOF ¶ 46. As part of quarantine procedures, International Media removed the ability of users to search for or browse to the identified videos on the IM Websites. CSOF ¶ 47.

In December 2012—*i.e.*, almost seven (7) months after it filed its Complaint in this matter—Cybernet sent International Media DMCA 512(c) take

---

[2] Nor is there any evidence that Mr. Brachat was acting for or on behalf of Defendant Igor Gens, personally. As such, there is no factual or legal basis in Cybernet's Motion for awarding summary judgment against Igor Gens.

4

down notices for the allegedly infringing files identified in the Complaint—including the 14 videos at issue in Cybernet's Motion.  CSOF ¶ 48.  Once International Media received the take down notices, it completely disabled access to the allegedly infringing videos on the IM Websites, but did not delete the underlying videos in consideration of the prior litigation hold resulting from this lawsuit.  CSOF ¶ 49.

Sometime between December 2012 and July 15, 2013, Mr. Brachat unintentionally, and against International Media's rules and procedures, re-enabled access to approximately 21 of the files that had been disabled in December 2012.  CSOF ¶ 50.  Again, Mr. Tucker counted these 21 videos numerous times to arrive at his number of 115 in the Tucker Declaration—fourteen (14) of which are the subject of Cybernet's Motion.  CSOF ¶ 51.

On July 15, 2013, International Media was made aware that the 21 videos were accidently re-enabled and it immediately disabled access to the files.  CSOF ¶ 52.  Each of the videos identified by Cybernet in its DMCA take down notices have been disabled and International Media has taken and will continue to take all reasonable steps to ensure that the identified files will not be re-enabled and that the underlying video files will not be posted during the course of this litigation.  CSOF ¶ 53.

ii.     **Re-enabling Videos Which Were Already Uploaded to the IM Websites is not the same as Posting Them to the IM Websites.**

The 14 videos which are at issue in Cybernet's Motion were not posted on any page by Chad Brachat.  CSOF ¶ 54.  Instead, they were mistakenly removed from quarantine and re-enabled.  CSOF ¶ 55.  While the urls were publicly available, they were not posted on any page on International Media's webistes, nor was it possible to locate the videos through browsing the website.  CSOF ¶ 56.  The only way that the videos could have been accessed was if a person previously stored the exact url for the videos.  CSOF ¶ 57.  In contrast, once new videos are

uploaded by IM Websites users, they get posted on IM Website's busiest pages, with search results and are easily browsable and highly visible.  CSOF ¶ 58.   The erroneously re-enabled videos were not.  CSOF ¶ 58.

## II.    DEFENDANTS ARE PROTECTED FROM MONETARY RELIEF UNDER THE SAFE HARBOR PROVISIONS OF THE DMCA.

In enacting the DMCA, "Congress recognized that in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir 2013) (internal citations omitted).  Although Congress was aware that service providers are capable of being misused to facilitate copyright infringement, "it was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions.  Congress decided that by limiting service providers' liability, it would ensure that the efficiency of the Internet will continue to improve and the variety and quality of service on the Internet will continue to expand." *Id*.  To that end, Congress enacted safe harbors that preclude imposing monetary liability on service providers for: (1) transitory digital network communications; (2) system catching; (3) information residing on systems or networks at the direction of users; and (4) information location tools.  *Id*.; *See*, *Perfect 10, Inc. v. CCBILL, LLC*, 488 F.3d 1102 (2007).  Protection under the DMCA safe harbors in 17 U.S.C. § 512(c) includes liability under the doctrines of direct, vicarious, contributory and inducement liability.  *Id*.; *See also UMG Recordings, Inc.*, 718 F.3d at 1028-1029 (noting that § 512(c) includes protection for vicarious and contributory liability); *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1039-1040 (2013) (applying DMCA safe harbors to inducement liability).

As set forth in Defendants' Motion for Summary Judgment (Doc. 114), Cybernet has admitted, by its failure to timely answer International Media's

requests for admission, that Defendants' are protected from monetary liability for Cybernet's claims under the safe harbor provisions of the DMCA.   Defendants hereby incorporate their Motion for Summary Judgment as set forth fully herein.

### A. DMCA Threshold Requirements

To qualify for the safe harbor provisions under the DMCA, a party must meet the following threshold requirements: (1) be a "service provider," as defined by 17 U.S.C. 512(k)(1); (2) have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works.  *Wolf*, 840 F.Supp.2d at 743; *IO Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1142 (N.D. Calif. 2008).

### i.      International Media is a Service Provider

A "service provider" under § 512(c) safe harbor is "a provider of online services or network access, or the operator of facilities therefor. . ."  *IO Group, Inc.*, 586 F.Supp.2d at 1143 n. 7.  This definition is intended to encompass a very broad set of internet entities.  *In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 658 (N.D. Ill. 2002) ("'service provider' is defined so broadly that we have trouble imagining the existence of an online service that would not fall under the definitions.").

International Media is a service provider.  17 U.S.C. § 512(k)(1)(B).  The IM Websites allow users to view streaming videos which are uploaded either by: (i) other users of the IM Websites or (ii) International Media's staff at the direction and with the authority of the producers of the videos.   CSOF ¶ 28.   The IM Websites are open and free of charge to anyone accessing the Internet over the age of 18.  CSOF ¶ 29.  Visitors to the sites are not charged a fee to access the sites. CSOF ¶ 30.   Similarly, individuals that upload videos or content to the IM Websites are not compensated by International Media. CSOF ¶ 31.  Courts have

D0106716/10410-001

routinely found services similar to International Media to be "service providers" under the DMCA. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F.Supp.2d 514, 518 (S.D.N.Y. 2010); *IO Group, Inc.*, 586 F.Supp.2d at 1143; *Wolf v. Kodak Imaging Network, Inc.*, 840 F.Supp.2d 742, 744 (S.D.N.Y. 2012) ("Because Photobucket offers a site that hosts and allows online sharing of photos and videos at the direction of users, Photobucket, like YouTube.com or Veoh.com, qualifies as a 'service provider' under § 512(k)(1)(B).").

### ii.     International Media has Adopted and Reasonably Implemented a Repeat Infringer Policy.

As a condition to safe harbor liability, a service provider must have adopted, reasonably implemented, and informed subscribers and account holders of the service provider's system of a repeat infringer policy.   17 U.S.C. § 512(i)(1)(A).  The DMCA does not define what "reasonably implemented" means. However, the Ninth Circuit has found that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications*." Perfect 10, Inc. v. CCBill LLC*, 488 F. 3d 1102, 1109 (9th Cir. 2007).  "The statute permits service providers to implement a variety of procedures, but an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." *Id*.  The DMCA requires reasonable, not perfect policies. *IO Group, Inc*. 586 F.Supp.2d at 1144.  Further, there is no requirement that a service provider's track users in a particular way or to affirmatively police users for evidence of repeat infringement.    *Id*; *CCBill, LLC* 488 F.3d at 1111.

Here, International Media has adopted, reasonably implemented and notified its users of its repeat infringer policy and has a designated agent with the United States Copyright Office in accordance with 17 U.S.C. § 512(c)(2).  CSOF

D0106716/10410-001

¶¶ 34, 59 & 62.   International Media's repeat infringer policy, which is described in writing on the IM Websites, provides, among other things, that any user that engages in repeat infringement—defined as more than nine (9) valid DMCA notices received by International Media's Designated Agent resulting in the removal or disabling of identified infringing material—shall be subject to having any and all accounts known to belong to the repeat infringer terminated.  CSOF ¶ 59.  Further, upon receipt of a copyright infringement notice, International Media acts expeditiously to remove or disable access to the potentially infringing materials.   CSOF ¶ 60.   Indeed, during 2012 and 2013, International Media received approximately 2,730 copyright infringement notices and as a result removed or disabled access to 29,002 videos.   CSOF ¶ 61.   Further, to date International Media has banned 2,132 repeat infringers.  CSOF ¶ 62.

Mr. Brachat's accidental, and only partial re-enabling of 21 of the 29,002 videos removed or disabled by International Media cannot be said to be an unreasonable implementation of International Media's repeat infringer policy. Again, the DMCA requires reasonable, not perfect policies.  *IO Group, Inc*. 586 F.Supp.2d at 1144.  These videos were not posted on any page on International Media's websites, and could not be located through browsing on the websites. CSOF ¶ 54 & 56.  In fact, the only way these videos could have been accessed was if a person previously stored and entered the exact url for the videos.  CSOF ¶ 57. As soon as International Media was made aware of Mr. Brachat's error, which concerned 21 of the over 2 million videos on International Media's servicers, the 21 videos were immediately disabled.  CSOF ¶ 63.  International Media has taken and will continue to take all reasonable steps to ensure that the videos identified in Cybernet's DMCA notices will not be posted to the IM websites.

D0106716/10410-001

### iii. International Media Accommodates and does not Interfere with Standard Technical Measures

Under 17 U.S.C. § 512(i)(l)(B), a service provider must not interfere with "standard technical measures" that are used by copyright owners to identify or protect copyrighted works and: (a) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process; (b) are available to any person on reasonable and nondiscriminatory terms; and (c) do not impose substantial costs on service providers. "Standard technical measures" are a narrow group of technology-based solutions to online copyright infringement. *CCBill, LLC* 488 F.3d at 1115.

Here, there is no evidence that International Media interfered with any standard technical measures. The IM Websites are open and free of charge to anyone accessing the Internet over the age of 18. CSOF ¶ 29. Indeed, a reading of Cybernet's Motion and Jason Tucker's supporting declaration confirms that Cybernet has been fully able to discover the presence of its alleged protected works on the IM Websites. Further, International Media supports the industry standard digital video fingerprinting service made by Vobile to identify potentially infringing materials on the IM Websites. CSOF ¶ 64. Unfortunately, Cybernet does not use this service, despite the fact that it is free and would eliminate or substantially lessen any risk of infringement. CSOF ¶ 65.

### B. International Media Qualifies for Safe Harbor Protection Under 17 U.S.C. § 512(c)

17 U.S.C. § 512(c) provides:

> (1)   In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

D0106716/10410-001

(A)(i) does not have actual knowledge that the material or any activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

In addition, a service provider must designate and register with the Copyright Office an agent to receive notifications of claimed infringement.   17 U.S.C. § 512(c)(2).

### i.      Storage at the Direction of a User

Cybernet's Motion is consumed with its argument that with regards to the 21 videos which were accidently re-enabled, only fourteen (14) of which are at issue in Cybernet's Motion, International Media is not entitled to safe harbor protection because that material was not on International Media's system "by reason of the storage at the direction of a user."  Cybernet's narrow reading of 17 U.S.C. § 512(c) is not supported by case law or common sense.

"[T]he language makes clear, the statute extends to functions other than mere storage; it applies to 'infringement of copyright by reason of the storage at the direction of a user." *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.Supp.2d 1081, 1088-89 (C.D. Cal. 2008); see also, *UMG Recordings, Inc. v. Shelter Capital*

11

*Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013) (§ 512 encompasses the access facilitating process).  "Common sense and widespread usage establish that 'by reason of' means 'as a result of' or 'something that can be attributed to. . . .'  So understood, when copyrighted content is displayed or distributed on [a service provider's website] it is 'as a result of' or 'attributable to' the fact that users uploaded the content to [the service provider's] servers to be accessed by other means.  If providing access could trigger liability without the possibility of DMCA immunity, service providers would be greatly deterred from performing their basic, vital and salutary function—namely, providing access to information and material for the public."  *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.Supp.2d at 1088-89.

Here, the 14 videos that are the subject of Cybernet's Motion were only on International Media's servers because they were uploaded by users—six of which were uploaded with the express approval of Cybernet.  CSOF ¶ 66.  Although Cybernet attempts to create a question of fact by arguing that documents it received from Reflected Networks show different IP addresses for the users that uploaded the at issue videos than the user logs provided by Defendants in this case, any failure of the IP addresses to match in the various logs is the result of the protocol and is not evidence that the videos were not uploaded by third parties.  The Reflected Networks logs for the relevant period are FTP and ssh logs.  CSOF ¶ 67.  Defendants' upload mechanism uses http protocol.  CSOF ¶ 68.  As such, only http logs from Reflected Networks could be expected to match the http logs produced by Defendants.  CSOF ¶ 69.  Even more importantly, none of the logs, regardless of the protocol, suggest that the videos were not uploaded by third party users.  CSOF ¶ 70.

Further, Mr. Brachat's unintentional partial re-enabling of the videos does not change how they arrived on International Media's servers in the first place.  Nor does the mistrial act of making user uploaded materials able to be viewed and

accessed on IM Websites destroy DMCA safe harbor protection.  *Id*.  Indeed, as recognized by the *UMG Recordings* Court, numerous cases have similarly found that the safe harbor limits liability for activities involved in facilitating access to material uploaded at the direction of users.  *See*, e.*g., Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1094, 1110 (W.D. Wash. 2004) (section 512(c) applies to "any copyright infringement" by vendors who created websites using tools and forms provided by defendant, where defendant did not actively participate in or supervise the uploading of images and did not preview the images); *Hendrickson v. Amazon.com, Inc.*, 298 F.Supp.2d 914 (C.D. Cal. 2003) (section 512(c) applies to defendant for the sale of infringing goods on its website by third parties); *Hendrickson v. eBay, Inc.*, 165 F.Supp.2d 1082, 1087-88 (C.D. Cal. 2001) (section 512(c) shields defendant operator of website from liability for third parties' sale and distribution of infringing material on its site, which provided an online forum, tools, and services, because § 512(c) applies to liability for material "stored and displayed on the service provider's website" and "infringing 'activity using the material'").

Cybernet seemingly argues in its Motion that because IM Websites allow third parties to embed videos from the IM Website on their own website that International Media is somehow not eligible for safe harbor protection.  However, there is nothing particular about this feature, which is commonplace for streaming video websites of every variety (including YouTube).  CSOF ¶ 71.  Further, International Media retains the same ability to disable embedded videos as it has over videos directly on the IM Websites.  CSOF ¶ 72.  All that the ability to embed a video does is provide a sort of viewing screen to the IM Website server where the video is hosted, so that video can play without returning to the IM Website itself.  CSOF ¶ 73.  This means that when International Media disables or deletes videos on the IM Websites, all embedded versions of those deleted videos, regardless of where they are embedded elsewhere on the Internet, are also disabled.  CSOF ¶ 74.

Finally, and most importantly, any embedding is done by the user, not International Media.  *See Wolk v. Kodak Imaging Network, Inc*. 840 F.Supp.2d 724, 745 (S.D.N.Y. 2012) (users utilizing service provider's editing tools to remove watermarks on electronic images uploaded did not disqualify service provider from safe harbor eligibility).

### ii. International Media did not have Actual Knowledge of the Alleged Infringing Activity and was not Aware of Facts or Circumstances from Which Infringing Activity is Apparent.

It is undisputed that prior to December 2012—*i.e.*, almost seven (7) months *after* it filed its Complaint in this action—Cybernet failed to provide any DMCA compliant notices of the alleged infringing activity to International Media. CSOF ¶ 48.  Thus, there is no question that International Media lacked actual knowledge of the alleged infringing activity.  *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013). ("[Plaintiff's] decision to forego the DMCA notice protocol stripped it of the most powerful evidence of a service provider's knowledge-actual notice of infringement from the copyright holder.") (*citing Corbis Corp*., 351 F.Supp.2d at 1107).

There is also not any evidence that International Media was aware of facts or circumstances from which infringing activity is apparent.  In determining whether a service provider has such "red flag" awareness, "the question is not 'what a reasonable person would have deduced given all circumstances." *Corbis Corp*. 351 F.Supp.2d at 1108.  "Instead the question is whether the service provider deliberately proceeded in the face of blatant factors of which it was aware."  *Id; UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 ("general knowledge that [defendant] hosted copyrightable material and that it services could be used for infringement is insufficient to constitute a red flag").  Instead, a service provider must have specific knowledge of the particular

infringing activity to raise a red flag. *Id.* at 1021. This is because Courts "do not place the burden of determining whether [materials] are actually illegal on a service provider" and "impose no such investigative duties on service providers." *Id.* at 1023. Here, there is no evidence in the record that International Media had specific knowledge of the specific alleged infringing activity prior to receiving Cybernet's Complaint and subsequent DMCA notices.

### iii. International Media did not have the right and ability to control the alleged infringing activity

A service provider may lose the protection of § 512(c) where it (a) has the right and ability to control the infringing activity and (b) receives a financial benefit directly attributable to such activity. *IO Group, Inc.*, 586 F.Supp. at 1150; 17 U.S.C. 512(c)(1)(B). "Both elements must be met for the safe harbor to be denied." Id. (citing *Corbis Corp.*, 351 F.Supp.2d at 1109).

"[T]he pertinent inquiry is not whether [Defendant] has the right and ability to control its *system*, but rather, whether it has the right and ability to control the *infringing activity*." *IO Group*, 586 F.Supp.2d at 1151. The statute presupposes a service provider's control of its system or network. *Id.* As such, the right and ability to control infringing activity does not simply mean the ability of a service provider to block or remove access to materials posted on its website or stored on its system. *Id.*

In order to have the "right and ability to control," the service provider must "exert []substantial influence on the activities of its users." *UMG Recordings, Inc.* 718 F.3d 1006, 1030 (9th Cir. 2013). However, substantial influence over the infringing activity is *not* present where: (a) the allegedly infringing material is on the service provider's system; (b) the service provider had the ability to remove such material; (c) the service provider could have implemented, and did

implement, filtering systems; and (d) the service provider could have searched for potentially infringing content.  *Id*.

A service provider is not required to prescreen every file before it is uploaded.  *IO Group, Inc*. 586 F.Supp.2d at 1153.  Nor is it required to change its business operations to prevent infringing activity from occurring on its website.  *Id*. at 1154.  Moreover, a service provider does not exert substantial influence on infringing activities of its users where it takes steps to reduce the incidence of copyright infringement on its website.  *Id* at 1153-54 (finding no genuine issue of material fact where a service provider actively enforces its user policy, promptly responds to infringement notices, terminates infringing content, and acts to prevent the same infringing content from being uploaded again through its fingerprint technology).

Here, there is no evidence that International Media had the right and ability to control the alleged infringing activity.  Further, International Media actively enforces its user policy.  During 2012 and 2013, International Media received approximately 2,730 copyright infringement notices and as a result removed or disabled access to 29,002 videos.  CSOF ¶ 61.  To date, International Media has banned 2,132 repeat infringers.  CSOF ¶ 62.  Further, International Media supports the industry standard digital video fingerprinting service made by Vobile to identify potentially infringing materials on the IM Websites.  CSOF ¶ 64.  This service is provided by International Media free of charge and eliminates or substantially lessens any risk of infringement.  CSOF ¶ 65.

Finally, International Media does not receive a financial benefit directly attributable to the alleged infringing activity.  17 U.S.C. 512(c)(1)(B).  Cases examining what constitutes a direct financial benefit have stressed the difference between a service provider that receives a financial benefit as a result of providing services generally and one that receives a financial benefit directly attributable to

D0106716/10410-001

infringing activity. "Where there is no evidence in the record that the service provider attracted or retained subscriptions because of the infringement or lost subscriptions because of its eventual obstruction of the infringement, no reasonable jury could conclude that the service provider received a direct financial benefit from providing access to the infringing material." *Wolk*, 840 F. Supp.2d at 748 (*citing Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007)); *see also MP3tunes*, 821 F.Supp.2d at 645 ("[T]he financial benefit must be attributable to the infringing activity."); *Perfect 10,* 488 F.3d at 1117 (9th Cir. 2007) ("[T]he relevant inquiry is whether the infringing activity constitutes a draw for subscribers, not just an added benefit …"); *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs.,* 907 F. Supp. 1361, 1377 (N.D. Cal. 1995) (finding no "direct financial benefit" where there was no evidence that the allegedly infringing materials "in any way enhances the value of Netcom's services to subscribers or attracts new subscribers.").

Here, the IM Websites are open and free to anyone accessing the Internet over the age of 18.  CSOF ¶ 29.  Visitors to the sites are not charged a fee to access the sites.  CSOF ¶ 30.  Similarly, individuals that upload videos or content to the websites operated by International Media are not compensated by International Media. CSOF ¶ 31.  International Media generates revenue almost entirely from selling advertising space.  CSOF ¶ 32.  As such, there is simply no evidence that International Media received any financial benefit directly attributable to the 14 videos at issue in Cybernet's Motion, especially given there are over 2 million videos on International Media's servers.

### iv. Upon DMCA compliant notification, International Media acts expeditiously to remove or disable access to files that were claimed to be infringing.

A service provider is also not liable under § 512(c) where it acts "expeditiously to remove, or disable access to, the material" when it (1) has actual

knowledge, (2) is aware of facts or circumstances from which infringing activity is apparent, or (3) has received notification of claimed infringement meeting the requirements of § 512(c).  "Were we to require service providers to terminate users under circumstances other than those specified in § 512(c), § 512(c)'s grant of immunity would be meaningless."  *CCBill, LLC* 488 F.3d at 1111.  § 512(c) does not define what constitutes an "expeditious" removal or disabling of access to the infringing content.  Nor does the DMCA require service providers to deal with infringers in a particular way.  *See* CCBill, 488 F.3d at 1109.

Here, International Media has satisfied the requirements of § 512(c)(1)(C).  Upon receiving the Complaint, International Media placed in quarantine each of the videos identified in the Complaint as being allegedly infringing.  CSOF ¶ 46.  As part of its quarantine procedures, International Media removed the ability of users to search for or browse to the identified videos on the IM Websites.  CSOF ¶ 47.

Seven months after it filed its Complaint, Cybernet finally sent DMCA compliant notices for the allegedly infringing files identified in the Complaint— including the 14 videos at issue in Cybernet's Motion.  CSOF ¶ 48.  Once International Media received the take down notices, it completely disabled access to the allegedly infringing videos on the IM Websites, but did not delete the underlying videos in consideration of the prior litigation hold resulting from this lawsuit.  CSOF ¶ 49.

As discussed above, due to a pure mistake and contrary to International Media's rules and procedures, Mr. Brachat—International Media's independent contractor—accidently re-enabled 21 of the videos that had been quarantined upon receipt of Cybernet's Complaint and disabled upon receipt of its DMCA notices in December 2012.  CSOF ¶ 42.  As soon as International Media was made aware of Mr. Brachat's error, the videos were immediately disabled.  CSOF ¶ 52.

D0106716/10410-001

1    The DMCA requires reasonable, not perfect policies.  *IO Group, Inc*. 586

2    F.Supp.2d at 1144.   Mr. Brachat's accidental re-enabling of 21 of the 29,002

3    videos removed or disabled by International Media during 2012 and 2013 cannot

4    be said to be an unreasonable implementation of International Media's take down

5    policy.   Again, these videos were quarantined upon receipt of Cybernet's

6    Complaint, were disabled upon receipt of Cybernet's DMCA notices (7 months

7    after it filed its Complaint), and even though they were accidently re-enabled for a

8    brief period of time, they were not posted on any page on International Media's

9    websites, and could not be located through browsing on the websites.  CSOF ¶ 56.

10   The only way these videos could have been accessed was if a person previously

11   stored and entered the exact url for the videos.  CSOF ¶ 57.  Upon notice, these

12   videos were immediately disabled.  CSOF ¶ 52.  International Media has taken and

13   will continue to take all reasonable steps to ensure that the videos identified in

14   Cybernet's DMCA notices will not be posted to the IM websites.

15/16   **III.   DEFENDANTS   DID   NOT   INFRINGE   CYBERNET'S COPYRIGHTS**

17   To state a claim for copyright infringement, a plaintiff must show that the

18   defendant engaged in a volitional act causing the copying of the copyrighted

19   material at issue. *The Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d

20   121, 131 (2d Cir. 2008); *Wolk v. Kodak Imaging Network, Inc.,* 840 F. Supp.2d

21   724, 741-42 (S.D.N.Y. 2012) ("Direct liability requires 'volitional conduct' that

22   'causes' the infringement."). As the United States Supreme Court recently held:

24   A defendant may be held directly liable only if it has
25   engaged in volitional conduct that violates the Act. . . .
     Every Court of Appeals to have considered an automated-
26   service provider's direct liability for copyright infringement
     has adopted that rule. . . . Although we have not opined on
27   the issue, our cases are fully consistent with a volitional-
     conduct requirement. For example, we gave several

1

2

> examples of direct infringement in *Sony,* each of which involved a volitional act directed to the plaintiff's copyrighted material.

3

4

*Am. Broad. Companies, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2512-13 (2014) (multiple citations omitted).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The volitional conduct requirement – a fundamental element of the Plaintiff's direct infringement claim – requires that there be sufficient allegations that the defendant engaged in volitional conduct with a nexus sufficiently close and causal to the alleged infringement such that it was the defendant, itself, who actually trespassed on the rights of the copyright owner. *Cartoon Network,* 536 F.3d 121, 131-32 (2d Cir. 2008); *CoStar Group, Inc. v. Loopnet, Inc.,* 373 F.3d 544, 549 (4th Cir. 2004) ("[S]omething more must be shown than mere ownership of a machine used by others to make illegal copies[;] [t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner."). Merely alleging that the defendant operated a service that "allows users to upload and download copyrighted material without volitional conduct" is insufficient even on a site where the Court finds the existence of "massive infringement." *Disney Enters. v. Hotfile Corp.,* 798 F. Supp. 2d 1303, 1308 (S.D. Fla. 2011). In granting the defendants' Motion to Dismiss claims of direct copyright infringement, the *Hotfile* Court held that, "[N]othing in the complaint alleges that Hotfile or Mr. Titov took direct, volitional steps to violate the plaintiffs' infringement. There are no allegations, say, that Hotfile uploaded copyrighted material. Therefore, under the great weight of authority, the plaintiffs have failed to allege direct copyright infringement."

25

26

27

Here, there is no evidence that Defendants directly infringed Cybernet's 14 films.   These films were on International Media's servers as a result of and attributable to the fact that users uploaded them.   The ministerial act, albeit

28

D0106716/10410-001

1   unintentional, of re-enabling the files that were already on the server is not

2   equivalent to directly posting them on the IM Websites in the first instance.  *See*

3   *Ellison*, 189 F.Supp.2d at 1057 (direct infringement liability should be limited to

4   the users who were responsible for the actual copying).

5         There is also no evidence that Defendants vicariously infringed Cybernet's

6   14 films.  A Defendant is vicariously liable for copyright infringement only if he

7   enjoys direct financial benefit from another's infringing activity and has a right and

8   ability to supervise infringing activity.  *Ellison* 357 F.3d at 1076.  As discussed

9   above, there is no evidence that Defendants received a direct financial benefit from

10  the 14 films or that the Defendants had the requisite ability to supervise the

11  infringing activity.

12        Finally, there is no evidence that Defendants are liable for contributory

13  infringement.  One who, with knowledge of the infringing activity, induces, causes

14  or materially contributes to the infirming conduct of another may be liable as a

15  contributory infringer.  *Id*.  Such knowledge includes actual knowledge and those

16  who have a reason to know of direct infringement.  *Id*.  Here, as discussed above,

17  there is no evidence that Defendants had knowledge of the infringing activity.  Nor

18  is there any evidence that Defendants intentionally induced or materially

19  contributed to the alleged infringing activity.

20      **IV.**   **CONCLUSION**

21        Defendants have met all elements for DMCA safe harbor protection and

22  therefore cannot be held liable for monetary relief.  17. U.S.C. § 512(c).  The

23  DMCA safe harbors protect qualifying service providers from liability for all

24  monetary relief for direct, vicarious and contributory infringement, leaving

25  copyright owners with limited injunctive relief.  *IO Group, Inc*., 586 F.Supp.2d at

26  1142.  Given that Defendants have removed and quarantined the allegedly

27  infringing material, any injunction would be moot and should not be considered by

28

the Court.  SOF 10-12.  As such, Cybernet lacks any available remedy for its claims and its Motion should be denied.  *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1098 (W.D. Wa. 2004) ("[E]ven if [plainitff's] copyright infringement claims can bare [sic] fruit, [defendant's] liability protection ensures that the claims will wither on the vine").  Further, there is no evidence that Defendants infringed Cybernet's copyrights.

**RESPECTFULLY SUBMITTED** this 15th day of September, 2014.

**DIOGUARDI FLYNN LLP**


By:  /s/ Peter Moolenaar
     John P. Flynn (# 015065)
     Peter J. Moolenaar (# 024487)
     *Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of September, 2014, I transmitted the foregoing document to the Clerk of the United States District Court, District of Arizona, using the ECF System for filing and transmittal of a Notice of Electronic File to the following ECF registrants:

Chad L. Belville
Attorney at Law
4742 N. 24th Street, Suite 315
Phoenix, AZ 85016
cbelville@azbar.org
*Attorney for Plaintiff*

Spencer D. Freeman
Attorney at Law
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
sfreeman@freemanlawfirm.org
*Attorney for Plaintiff*


By: /s/ Megan Barber

D0106716/10410-001